IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LORRAINE BASIL HORNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 07-1634 |
| v. | ) | |
| | ) | |
| ALLEGHENY GENERAL HOSPITAL, | ) | |
| WEST PENN ALLEGHENY HEALTH | ) | |
| SYSTEM, t/d/b/a/ ALLEGHENY | ) | |
| GENERAL HOSPITAL, and WEST PENN | ) | |
| ALLEGHENY HEALTH SYSTEM, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

CONTI, District Judge.

I.     **Introduction**

Pending before the court is the motion for summary judgment (Docket No. 23) filed by

defendants Allegheny General Hospital ("AGH"), West Penn Allegheny Health System

("WPAHS"), t/d/b/a/ Allegheny General Hospital and West Penn Allegheny Health System

(collectively "defendants"), with respect to the claims asserted by plaintiff Lorraine Basil Horner

("Horner" or "plaintiff") under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§§ 2000(e) *et seq.* ("Title VII"); the Age Discrimination in Employment Act, as amended, 29

U.S.C. § 621 *et seq.* ("ADEA"); and the Pennsylvania Human Relations Act, as amended 43 PA.

CONS. STAT. §§ 951, *et seq.* ("PHRA").  Plaintiff asserts claims against defendants for

employment discrimination based upon sex and age arising from defendants' failure to hire

plaintiff for an open position of manager of inventory and purchasing in their pharmacy

department (the "pharmacy manager") on or about November 2005 and on or about April 2006.

(Compl ¶ 1.) (Docket No. 1.)  Plaintiff filed these claims initially with the Equal Employment

Opportunity Commission ("EEOC") and cross-filed with the Pennsylvania Human Rights

Commission ("PHRC").[1]  After considering defendants' motion for summary judgment,

plaintiff's response, the parties' respective memoranda of law, the parties' joint statements of

material facts ("J.S. I")(Docket No. 40), and the Local Rule 51.C.1(c ) additional material facts

("J.S. II")(Docket No. 40),[2] the court will grant in part and deny in part defendants' motion for

summary judgment for the reasons set forth below.

## II.    Factual Background

The factual background is derived from the undisputed evidence of record and the

disputed evidence of record viewed in the light most favorable to the nonmoving party.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is

to be believed, and all justifiable inferences are to be drawn in his favor.").

---

[1]    PHRA claims are treated consistently with claims brought under federal anti-discrimination statutes.  Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 n.5 (3d Cir. 2006) (the analysis required for adjudicating plaintiff's claim under the PHRA is identical to a Title VII inquiry); Goosby v. Johnson & Johnson Med., 228 F.3d 313 (3d Cir. 2000) (same); Fogelman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002) (holding, in an ADEA case, "that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently"). Here, neither party argues that the PHRA requires a different analysis.  This court will not separately address plaintiff's claims under the PHRA.

[2]    The parties' Joint Statement of  Material Facts consists of defendant's statement of material facts with plaintiff's answers, containing paragraphs 1-51 on pages 1-26 which will be referred to as J.S. I, and plaintiff's "other necessary material facts" in response to defendants' motion for summary judgment with defendant's answers, containing paragraphs 1-50 on pages 26-41 which will be referred to as J.S. II.

A.     The Parties

Plaintiff is a female whose date of birth is August 26, 1955.  (J.S. I ¶ 1; Compl. ¶4. )

Plaintiff is a licensed pharmacist in the Commonwealth of Pennsylvania who graduated, magna

cum laude, with a bachelor of science ("B.S.") in pharmacy from the University of Pittsburgh in

1978. ( Pl.'s App., Ex. 12 (Docket No. 35); J.S. II ¶ 1.)  Plaintiff received a master of science in

business administration degree ("M.B.A.") from the University of Pittsburgh in 1984 and a

master of science in education degree from Duquesne University in 2004.  (Pl.'s App., Ex. 12.)

On July 23, 1999, AGH, a tertiary[3] care hospital, became part of the WPAHS regional

health system.  (J.S. I ¶ 4.)  WPAHS is comprised of two tertiary hospitals, AGH and West Penn,

and four regional hospitals, Suburban General, Forbes Regional, Alle-Kiski Medical Center and

Canonsburg General Hospital, and Forbes Hospice.  (J.S. I ¶ 4.)  During the relevant time, AGH

employees implicated in plaintiff's claims included: pharmacy manager of systems operations,

Thomas Grande ("Grande"); acting pharmacy manager of clinical services, Ed Seidl ("Seidl);

pharmacy manager of medication safety, regulatory and professional development, Linda

Weiloch ("Weiloch"); director of pharmacy, Laura Mark ("Mark"); pharmacy technician, Roxane

Curinga ("Curinga"); human resource consultant, Janet Eggleston ("Eggleston"); and vice-

president of operations and chief nurse officer, Judith Zedreck, now Zedreck-Gonzalez

("Zedreck-Gonzalez") (Defs.' App., Ex. 4; Pl.'s App., Ex. 20; Curinga Dep. 8-11, May 15, 2009,

---

[3]  "Tertiary hospital or medical center – means hospital or medical center based on
[United States Department of Health ("DOH")] standards – see DOH standards (generally, one
that has sophisticated medical services not only in terms of diagnostic facilities but also treatment
capabilities)."  http://hospmgt.tripod.com/howtoestablish.htm

Defs.' App. B; Eggleston Dep. 6-11, Jun. 4, 2009, Defs.' App. G; Zedreck-Gonzalez Dep. 9-14,

Jun. 4, 2009, Defs.' App. F.)

> **B.      Plaintiff's Employment with AGH**

Plaintiff began her employment with AGH in 1983 as a part-time pharmacist.  (Pl.'s Dep.

38, Aug. 18, 2008, Defs.' App. A; J.S. ¶ 2.)  From January 1984 to December 1998, plaintiff

worked full time as the manager of financial services in pharmacy at AGH.  (Pl. Dep. 17, 38-39;

J.S. II ¶ 2.)  Plaintiff had system-wide responsibilities for AGH, through AHERF, an integrated

hospital delivery system which included fourteen primarily tertiary care hospitals.  (J.S. II ¶¶ 4,

6.)  She served as vice chairman of the VHA[4] pharmacy director's task force and chairman of the

VHA customer supplier task force.  (J.S. II ¶ 6.)  Plaintiff participated in the purchasing plan for

Southwest Integrated Delivery Network and the home intravenous ("IV") infusion program

utilized by several hospitals across the VHA.  (J.S. II ¶ 6.)  She was a member of the Ob/Gyn

utilization team, worked with the corporate legal department and nursing to investigate and

improve revenue from outpatient billing and evaluated the feasibility of establishing an IV micro-

manufacturing facility.  (J.S. II ¶¶ 6-9.)  Plaintiff regularly monitored revenue codes and

diagnosis codes, late charges and high cost medications.  (J.S. II ¶ 39.)  She provided corporate-

wide reports and attended regularly scheduled corporate-wide meetings.  (J.S. I ¶ 14.)

Toni Fera ("Fera"), director of pharmacy during plaintiff's tenure, stated:

> Lorraine continues to exceed expectations in all major
> responsibilities.  Assignments are completed in a timely, accurate
> manner with minimal supervision. . . .

---

[4]  The court assumes the term "VHA" is a reference to VHA, Inc., formerly known as the
Voluntary Hospitals of America.  See https://www.vha.com

> Over this past year, Lorraine continued to develop relationships beyond
> the pharmacy department, such as the AHERF purchasing project,
> physician offices, and the Ob/Gyne utilization management
> team. . . .

(Pl.'s App. Ex. 8;  J.S. I ¶ 29.)  Fera rated plaintiff's performance as  "[e]xceeds all expectations:

100 per cent of plan objectives and job responsibilities were exceeded."  (*Id.*)  Fera later noted

that plaintiff "expanded involvement in integrated health care system issues including

ambulatory care, multi-hospital systems and revenue enhancement.  Thanks for the extra effort."

(Pl.'s App., Ex. 15;  J.S. I ¶ 29.)  In December 1998, plaintiff voluntarily resigned her full-time

position and began working as a part-time casual pharmacist.  (J.S. I ¶ 3.)  She worked on a part-

time basis until December 2005.  (Id.)

### C.   Replacements in the Pharmacy Manager Position and Responsibilities of Position

In December 1998, Curinga replaced plaintiff in plaintiff's former full-time pharmacy

manager's position.  (Curinga Dep. 10-14; J.S. I ¶ 8.)  Curinga, a pharmacy technician, assumed

some of plaintiff's former management responsibilities.  (Curinga Dep. 14; J.S. I ¶¶ 8, 9.)

Curinga did not negotiate contracts or perform plaintiff's clinically related management

responsibilities.  (Curinga Dep. 15-16, 49-52; J.S. I ¶ 8.)  Toward the end of Curinga's time of

employment, her position included "a lot more system involvement with West Penn Allegheny

Hospital and the sister hospitals."  (Curinga Dep. 31-32; J.S. I ¶ 10.)  This increased involvement

resulted in regularly attending WPAHS pharmacy directors' group meetings and providing

reports for the hospitals in the system.  (Curinga Dep. 38-40; J.S. I ¶ 10.)  Curinga testified that

she did not think that her job description changed during her tenure of employment with

defendants.  (Curinga Dep. 33; J.S. I ¶ 10.)  Curinga resigned her full-time position on April 1,

2005, due, among other reasons, to concerns relating to clinical issues that she felt were necessary to carry out her duties.  (Curinga Dep. 49-52; J.S. I ¶ 11.)  Most of the corporate-wide initiatives at the time Curinga fulfilled them were "clinical".  (Mark Dep. 49-50, May 15, 2009, Defs.' App. H; J.S. ¶ 11.)  After Curinga resigned her full-time position, she continued to work part time until March 2007.  (Curinga Dep. 34, 61; J.S. I ¶ 12.)

On or about April 2005, AGH advertised a pharmacy manager position indicating it required a B.S. degree in pharmacy or health administration, a preferred master's degree, and experience with financial accounting.  (Pl.'s App. Ex. 21; J.S. II ¶ 22 .)  The August 9, 2005 job description of the manager's position duties and responsibilities included a listing in order of importance of the eight essential functions of the job, which was identical to the previous job description dated March 1, 2004.  (Pl.'s App. Exs. 5, 9; J.S. II ¶¶ 12-14 .)

Three pharmacy managers, Grande, Seidl, and Wieloch, were involved in finding Curinga's replacement.  (Grande Dep. 105-06, Mar. 11, 2009, Defs.' App. C; J.S. I ¶ 13.)  AGH identified Grande as the person by whom the "hiring decision will be made."  (Pl.'s App., Ex. 3; J.S. I ¶ 13.)

Grande indicated that the August 9, 2005 job description went through "several rewrites". (Pl.'s App., Ex. 6; J.S. I ¶ 14.)  The position summary of the August 9, 2005 job description and for the March 1, 2004 position, however, are virtually identical.  The responsibilities of the job were described as: "[p]rovides analyses . . . relevant to system wide initiatives, and assisting in their implementation."  (Pl.'s App. Exs. 5, 9; J.S. I ¶ 14.)  The job duties in both descriptions are listed in the same order of importance.  (*Id.*)  System-wide responsibilities are listed last, comprising 20% of the job responsibilities.  (Pl.'s Exs. 5, 9; J.S. I ¶ 14.)

Grande described the pharmacy department at the time as "moving in a direction departmentally that was going to involve corporate-level activities" that would "potentially change the way we did purchasing," and involved changes to budgeting, including the use of a new information management system ("IMS") to develop, justify and change the pharmacy budget. (Grand Dep. 107-08; J.S. I ¶14.)  Grande agreed that the IMS used for budgeting was specific to AGH and was

> a function of information being entered into a software system and
> a result coming out of that which either is consistent with what you
> expected or not either in terms of pricing or budget, and if there's a
> variance, you have to explain it.

(Grand Dep. 110-11; J.S. I ¶ 14.)  Curinga testified that in April 2005, AGH continued to use the systems created by plaintiff, which included software programs for the monitoring of pharmaceutical purchases, budgeting, and costs.  (Curinga Dep. 12-13, 57; J.S. I ¶14.)  Grande acknowledged that many of the software programs designed by plaintiff were in use as of April 2005 and that the WPAHS effort to standardize pharmacy systems was the same as when AHERF took over AGH.  (Grand Dep. 97, 102-03; J.S. I ¶14.)

With respect to the corporate nature of the position, Seidl testified:

> The corporate involvement was very time consuming.  And we
> really felt that the person stepping into this position was going to
> have to play a big role and spend a lot of time working on these
> corporate initiatives because it was taking a lot of my time as well
> as Roxanne's when she was there.

(Seidl Dep., 32-33, Apr. 20, 2009, Defs.' App. D; J.S. I ¶15.)  Seidl participated in the creation of the August 2005 job description that assigned system-wide duties the least important activity listed with a twenty per cent time allocation.  (Seidl Dep. 31-32; J.S. I ¶15.)

7

Weiloch reported that the departmental involvement in corporate initiatives was

> Attending those [corporate level] meetings, handling the corporate
> initiatives, the changes that were going to be coming.  Like the
> creation of a system P&T [Pharmacy and Therapeutics], those
> types of things.

(Weiloch Dep. 42, Apr. 20, 2009, Defs.'s App. E; J.S. I ¶16.)

Zedreck-Gonzalez was responsible for overseeing the pharmacy department.  (Zedreck-Gonzalez Dep. 34, Jun. 4, 2009, Defs.'s App. F; J.S. I ¶17.)  Zedreck-Gonzalez testified that with respect to the impact that system-wide integration would have on the manager position:

> It was going to be more of the relationships within the system.
> There was going to have to be a need to work with not only other
> pharmacy directors but other vice presidents.  Corporate
> purchasing was becoming more involved as each day transpired,
> and the positions within all those roles were going to be important
> for the person in this job to have expertise related to those types of
> relationships, interactions, and looking broadly related to
> opportunities for savings, expenses across the system, what might
> apply to Allegheny General might be different at West Penn, and
> the ability to look broadly at those opportunities or situations.

(Zedreck-Gonzalez Dep. 34; J.S. I ¶17.)  Zedreck-Gonzalez indicated, however, that she was not qualified to provide details about how the duties of pharmacy manager position had changed.

(Zedreck-Gonzalez Dep. 39; J.S. I  ¶17.)

### D.    Plaintiff's Interview

In April 2005, plaintiff saw a posting for the position of manager of purchasing, inventory and finances for the pharmacy department and applied for the position.  (Pl. Dep. 40; J.S. I ¶18.) At the end of May 2005 plaintiff was interviewed for the position   (Pl. Dep. 41; J.S. I ¶19.) Plaintiff was interviewed by Grande, Seidl, and Weiloch, each of whom worked with plaintiff for many years.  (Pl. Dep. 42; J.S. I ¶ 20.)  The interview lasted for approximately twenty minutes.

(Pl.'s Dep. 51; J.S. I ¶ 26.)  Plaintiff attached her resume to her application, but did not submit

any documents to the interviewers at the interview itself.  (Pl.'s Dep. 51; J.S. I ¶ 26.)  During the

interview, plaintiff described her experience with preparing an operational budget, developing

cost accounting programs and ensuring compliance with applicable standards.  (Pl. Dep. 46-47;

J.S. I ¶ 27.)  Plaintiff asked the interviewers how the job had changed and "[t]hey replied with the

duties [she] had been doing . . . everything they mentioned [she] had done . . . and done well . . .

."  (Pl. Dep. 47; J.S. I ¶ 27.)  Grande "did not articulate any changes . . . about the job

description."  (Pl. Dep. 58; J.S. I ¶ 29.)

The day after the interview, plaintiff sent letters to Grande, Seidl and Weiloch in which

she reiterated her achievements in performing the pharmacy manager's responsibilities, including

that she had "developed a unique method of budgeting and a database management system using

cost accounting principles" to reflect a computerized analysis of "expense variances due to

volume used, price paid, or change in inventory." (Grande Dep. 92; Pl.'s App., Ex.13; J.S. I ¶

26.)  Plaintiff asked a human resource consultant, Eggleston, about any changes in the job

description.  Eggleston informed plaintiff that "requiring that it be a pharmacist was the major

change. . .."  (Pl. Dep. 58-59; J.S. I ¶ 29.)  During her deposition plaintiff indicated[5] that she

believed she was the best qualified candidate for the position "[b]ecause [she] had performed 100

percent of the duties in the job description, and had done it well for 15 years."  (Pl. Dep. 53; J.S. I

¶ 28.)  Plaintiff added, " I guess even the new job description I had done all the job duties, so I

can't always relate it to the past."  (Pl. Dep. 53-54; J.S. ¶ 28.)

---

[5]     Because plaintiff had worked in a similar position, plaintiff's counsel objected to the form of the question when plaintiff was asked if it was her belief that she was capable of performing the job duties.

### E.    Partsch - The Candidate Selected to Fill the Position in December 2005

Matthew Partsch ("Partsch") was selected to fill the November 2005 opening.  (J.S. I ¶ 46.)  Partsch was born on September 21, 1970.  (J.S. I ¶ 47.)  He held a B.S. degree in pharmacy from the University of Pittsburgh.  (Partsch Dep. 8, May 15, 2009, Defs.' App. H; J.S. I ¶ 46.)  When he began his employment with AGH, Partsch was working on his M.B.A.  (J.S. I ¶ 46.)  Prior to his employment at AGH, Partsch worked as a regional inventory manager for NeighborCare, a closed-door pharmacy that supplied medications to long-term care facilities.  (Partsch Dep. 23-25; J.S. I ¶ 46.)  Partsch testified that he was part of the operations team, primarily worked to manage inventory, evaluated contracts, prices, and budget in a region that stretched from Florida to Western Pennsylvania, and was involved in writing inventory policies for the entire company.  (Partsch Dep. 24-27, 51, J.S. I ¶ 46.)

Grande noted that during Partsch's interview he "showed us work that he was involved in that lent [sic] me to believe that he had the expertise and the knowledge that we were looking for at that point in time."  (Grande Dep. 118; J.S. I  ¶ 35.)

Partsch had no prior experience performing purchasing or inventory responsibilities in a tertiary care hospital.  (J.S. II ¶ 27.)  Partsch testified that he told the interviewers that he had no responsibility at his last position for profitability, reimbursement, pricing, or negotiating contracts or in a tertiary care hospital.  (Partsch Dep. 105-06; J.S. I ¶ 35.)  Partsch did not have

10

experience in DRGs,[6] HCPCS[7] codes, or monitoring high costs of medications.  (Partsch Dep. 105-06; J.S. I ¶ 35; J.S. II ¶¶ 32-35.)

Grande or Seidl told Mark, however, that Partsch was hired, in part, because he had significant experience with DRGs, J codes, HCPCS codes and late charges.  (Mark Dep.  32-33, 35-36; J.S. II ¶ 31.)  When asked if she ever confirmed that Partsch had experience with DRGs, Mark responded: "I think it was apparent when I interacted with him during that time in his role as manager and then at the corporate level."  (Mark Dep. 33; J.S. II ¶ 31.)  Partsch did not possess any experience with DRGs, however, since they were not applicable in his previous nursing home care employment which utilized a different reimbursement model.  (Partsch Dep. 56-57, 100; J.S. II ¶ 32.)

Partsch recalled the interviewers asking about and being impressed with his experience at the corporate level.

> I remember talking about that there was a new corporate structure at West Penn Allegheny and that part of this position would be to work with that corporate structure . . . that is what they did like about my previous experience is that I had experience working with multiple pharmacies across a wide scope . . . .

(Partsch Dep. 92; J.S. I ¶ 37.)  Partsch did not recall discussing how his experience related to the inventory needs at AGH.  (Partsch Dep. 83; J.S. I ¶ 37.)  Partsch did not tell the interviewers that he had any responsibility for negotiating contracts for the purchase of pharmaceuticals or

---

[6]     The term "DRG" is an acronym for "diagnosis related group".  (Pl.'s App., Ex. 7; J.S. II ¶ 28.)

[7]     The court assumes the term "HCPCS" is an acronym for "Healthcare Common Procedure Coding System."  http://www.cms.hhs.gov/apps/acronyms/results.asp?

familiarity with DRGs or monitoring high drug costs.  (Partsch Dep. 90; J.S. I ¶ 37.)  Partsch

testified that the obvious weakness on his "resume would have been acute care, dealing with

DRGs, and the HCPCS codes and the J codes . . . it was definitely not a strength. . .."  (Partsch

Dep. 100, 102; J.S. II ¶ 33.)  Partsch's prior experience involved management teams working

with clinical and operational pharmacists in purchasing, inventory and control, and in making

corporate presentations.  (Partsch Dep. 104-05.)  Partsch assumed that he would learn about

DRGs and HCPCS codes after he was hired.  (Partsch Dep. 104-05.)

      **F.**     **The Selection Process**

Grande, Seidl and Weiloch each indicated that plaintiff was not the best candidate for the

position.  (J.S. I ¶ 30.)  They contend that plaintiff, in her interview, focused on her past

achievements instead of her qualifications for the position going forward.  Seidl recalled that

plaintiff based most of her interview "on the fact that she had been in the position before."  (Seidl

Dep. 52; J.S. I ¶ 30.)  Seidl felt that while plaintiff had "strengths on paper, " he was "very

disappointed in the actual interview and her level of being prepared."  (Seidl Dep. 100; J.S. I ¶

30.)

Weiloch commented, "[s]he talked about – a lot about the things that she done in the past.

You know, these are the programs in the past.  This is what we did in the past."  (Weiloch Dep.

47; J.S. I ¶ 31.)  When Weiloch was asked during her deposition if she knew at the time Weiloch

interviewed plaintiff how many, if any, of the software programs plaintiff had implemented were

currently being utilized by defendants, Weiloch responded that she "did not know." (Weiloch

Dep. 47; J.S. I ¶ 31.)  Weiloch testified that she did not look at the programs or make any other

effort to determine whether or not the software programs that plaintiff had developed were still in

place in 2005.  (Weiloch Dep. 47-48; J.S. I ¶ 31.)

Grande expressed his concern that plaintiff lacked the necessary financial expertise and

experience for the position because she had not worked in that capacity for several years.

Grande also expressed concern related to plaintiff's time away from the profession.

(Grande Dep. 114, 122; J.S. I ¶ 32.)  When Grande asked plaintiff what she had done to "keep

up," plaintiff recalled:

> I told him I was a current employee.  Good financial principles
> don't change.  I told him I had just completed a total redo of my
> apartment and dealt with many parties and contracts and
> contractors, and I thought that was an example of project
> management.

(Pl. Dep. 50; J.S. I ¶ 33.)

One of the reasons Grande gave for not selecting plaintiff for the pharmacy manager's

position was that the job descriptions had significantly changed.  (Pl.'s App., Ex. 6; J.S. II ¶ 17.)

The August 9, 2005 job description required a B.S. or a pharmacy degree, licensed or eligible for

licensure to practice pharmacy in Pennsylvania, and preferred that the candidate have a master's

degree.  (Pl.'s App., Ex. 9; J.S. II ¶¶ 18-19.)  The March 1, 2004 job description did not require a

pharmacy degree.  (Pl.'s App., Ex. 5; J.S. II ¶ 18.)  Defendants  indicated that the position had to

be filled by "an individual with proven corporate skills – *i.e.*, one who not only worked closely

with DRG, but did so on a corporate level."  (Pl.'s App., Ex. 7; J.S. ¶ 35.)

Comparing plaintiff's interview with Partsch's interview, Seidl observed that:

> [Partsch] . . . really came into the interview prepared.  He
> demonstrated what he was doing at that time.  He gave us concrete
> examples.  Really was prepared for the interview.  And really
> showed skill sets not only dealing with the financial aspects.  He
> was a pharmacist and had knowledge of the drug.
>
>                                                  .   .   .

13

> . . . [T]hat's the difference.  Somebody came in very prepared.  Did their
> homework.  And Ms. Horner had done this in the past.  But it didn't seem
> like she was as prepared for this interview.  And didn't demonstrate that.
> She was given the opportunity and didn't seize the moment, so to speak.

(Seidl Dep. 55-56; J.S. I ¶ 36.)

When the interviewers were asked in their respective depositions whether they recalled

plaintiff being asked questions about plaintiff's corporate-wide or system-wide experience, each

denied any recollection.  When Wieloch was asked, "[d]uring the course of the interview with

Ms. Horner . . . .  Do you have any recollection of either yourself or anyone else asking her many

questions about whether she had any corporate-wide or system-wide experience," Wieloch

responded, "[n]o, I don't."  (Seidl Dep. 55-56; J.S. I ¶ 36.)  When Seidl was asked, "[d]o you

have any recollection of asking [plaintiff] questions about whether she performed system wide or

corporate-type work", Seidl replied, "I don't have recollection of that."  When Seidl was asked,

"[d]o you recall anybody else asking those questions", Seidl replied, "I don't."  (Seidl Dep. 53;

J.S. I ¶ 36.)  When Grande was asked,"had you made any inquiries as to whether . . . Ms. Horner

had performed any system-wide responsibilities . . .," Grande replied, "[n]o."  (Grande Dep. 176;

J.S. I ¶ 36.)

Eggleston testified that Grande and Weiloch came to her office and reported their

impressions of plaintiff's interview.

> I asked [Weiloch and Grand] how the interview went with
> [plaintiff] . . . they said that she basically didn't sell herself, that
> she just kept going back to how she held the position before . . .
> she didn't bring any presentations or bring anything to the
> interview, just kept referring back to how she held the position in
> the past, and they also had said about having some kind of -- I'm
> not sure if it would be a conflict or a rapport - - her rapport with
> some of the pharmacy staff, and they did not feel that she would be
> a good fit.

14

(Eggleston Dep. 29-30; J.S. I ¶ 38.)

Grande made the recommendation to hire Partsch to Zedreck-Gonzalez, who had

oversight responsibility for the pharmacy department.  (Zedreck-Gonzalez Dep. 26; J.S. I ¶ 41.)

On November 11, 2005, plaintiff was informed by letter that she was not selected for the

position.  (Pl. Dep. 54; J.S. ¶ 42.)  Thereafter, plaintiff spoke with Weiloch and Eggleston.  (Pl.

Dep. 55-56.; J.S. I ¶ 43. )  Both Weiloch and Eggleston referred plaintiff to Grande.  (Pl. Dep.

58-59; Weiloch Dep. 58-59; J.S. I ¶ 43.)

On December 1, 2005, plaintiff spoke with Grande.  Grande informed plaintiff that the

individual selected for the position, Partsch, had extensive responsibilities for managing the

inventory of a number of hospitals and long-term care facilities.  (Pl.'s Dep. 58; J.S. I ¶ 44.)

Grande sent Eggleston, a memo concerning his conversation with plaintiff.

> I spoke with [plaintiff] on Thursday, Dec. 1, 2005, concerning the
> Inventory Management position. [Plaintiff] had questions about the
> job description and how it changed.  I explained to her that the job
> description was changed to reflect the need for a pharmacists [sic]
> with a financial background and that this upgrade of the job
> description took several rewrites oveer [sic] the past several
> months.  Also, that the position would be more involved on the
> reimbursement side than previous since we needed to continuously
> monitor hogh [sic] cost meds, J codes, HCPCS codes, late charges,
> etc.
> She questioned wether [sic] we were requiring a graduate degree or
> specifically a finance degree.  I told her no.  That we required a BS
> Pharmacy or PharmD with financial experience.
> She stated several times that she was disappointed that someone
> else got the job when she felt we were still using some of the
> programs she put in place several years ago.  I explained that we
> were using some of the same programs but we have updated others
> over the years.
> I told her that the candidate that accepted the position was doing
> financial work now and had good experience with the types of
> inventory needs the department currently requires.  She again
> stated disappointment but went on to say she was working full time

as a teacher in a local high school.  She did not indicate that she is
resigning.

(Pl.'s App., Ex. 6;  J.S. I ¶ 45; Grande Dep. 113-14.)

In December 2005, plaintiff resigned from AGH.  (Pl.'s Dep. 31; J.S. I ¶ 6.)  In February 2006, approximately two months after Partsch was hired for the pharmacy manager position, he vacated that position and took the position of pharmacy contract administrator with AGH. (Partsch Dep. 13-14; J.S. I ¶ 48.)

### G.     Plaintiff's Charge

On March 24, 2006, plaintiff filed a charge of age and sex discrimination against AGH with the Equal Employment Opportunity Commission ("EEOC"), indicating that the discrimination took place on November 11, 2005 when she received a letter from AGH that she was not chosen for the position of manager of inventory and purchasing in the pharmacy department.  (Compl. Ex. 1.)  When plaintiff applied for the position she was working part time at AGH as a clinical pharmacist.  (Id.)  Plaintiff claimed to be uniquely qualified for the position because she had held the position from January 1984 through December 1998, with many of the "exact same duties and responsibilities as the position advertised in April of 2005."  (Id.) Plaintiff claimed that she was discriminated against based upon her sex and age when AGH hired a less qualified younger male applicant for the position.  (Id.)

On May 15, 2006, defendants indicated in a letter addressed to the EEOC ADR coordinator, Joel Pretz, that plaintiff's charge was "meritless" on the basis that "the Manager duties are radically different from those [plaintiff] had carried out," and that the position required "surgeon like coordination of all aspects" of patient critical care necessary for "one of the largest tertiary facilities in the region . . .."  (Pl.'s App., Ex. 7; J.S. II ¶¶ 25-26.)  Defendants indicated

that the role and the importance of DRGs had "skyrocketed since [plaintiff] left the position" and

was "a key, if not **the** key, factor" related to the economics of drugs.  (Pl.'s App., Ex. 7; J.S. II  ¶

28.)  Defendants indicated that they desired to fill the manager's position "with an individual

with  proven corporate skills - i.e.,  one who not only worked closely with DRG, but did so on a

corporate level."  (Pl.'s App., Ex. 7; J.S. II ¶ 28.)  The most significant point in selecting Partsch

over plaintiff for the pharmacy manager position was that Partsch had a high level background in

a corporate setting.  (Pl.'s App., Ex. 7; J.S. II ¶ 28.)  Plaintiff was not hired, in part, because she

lacked "system wide" experience.  (Pl.'s App., Ex. 7; J.S. II ¶ 41.)

WPAHS asserted in its May 15, 2006 correspondence to the EEOC, that in plaintiff's

interview:

> AGH asked [plaintiff] many questions to determine whether she
> had performed any of the corporate-type of work.  Her responses
> were uniform: I had performed the job well in the past and I will
> perform it well again.

(Pl.'s App., Ex.7; J.S. I ¶ 36.)  In that correspondence defendants indicated that one of the

reasons it did not select plaintiff for the position was that her "pre-1999 experience does not

necessarily translate as competency in the current position."  (Pl.'s App., Ex.7; J.S. II ¶ 43.)

### H.    The April 2006 opening

 Mark, who was hired by West Penn Allegheny Health System in January 2006 after

plaintiff voluntarily resigned, never worked with plaintiff.  (Mark Dep. 11-13, June 3, 2009; J.S.

I ¶ 50.)  As the director of pharmacy, Mark was responsible for hiring Partsch's replacement.

(Mark Dep. 42; J.S. I ¶ 49.)  Plaintiff did not apply for the position in 2006.  (J.S. I  ¶ 51.)

In May 2006, WPAHS hired David Cecere ("Cecere") to fill Partsch's vacated position.

(Mark Dep. 45; J.S. I ¶ 51;  J.S. II ¶ 43.)  Mark testified that Cecere demonstrated during the

interview process that he had an understanding and a knowledge basis of J codes, HCPCS,

reimbursement and billings.  (Mark Dep. 5-6; J.S. II ¶ 45.)  Mark also noted that Cecere's resume

indicated a role in "client education and system development," and included experience with

respect to inventory packages and the reimbursement process.  (Grande Dep.199.)  From 1999

through May 2006, Cecere did not have any experience in the areas of pharmaceutical inventory

and purchasing for a tertiary care hospital, DRGs, monitoring high cost medications, or J codes.

(Mark Dep. ¶¶ 51-54; J.S. II ¶¶ 44-48.)  Thus, Cecere was not involved in any purchasing or

inventory work during the same period of time that plaintiff was not performing those duties.

(Mark Dep. 51-52; J.S. I ¶ 28.)

Mark was the decision maker that hired Cecere.  (Mark Dep. 66)  Grande, Weiloch and

Seidl participated in the interviews for the April 2006 vacancy.  (Grande Dep. 197; Seidl Dep.

44; Weiloch Dep. 48.)  In considering the pharmacy manager position opening, Mark did not

contact any of the prior candidates, and testified that it was not her practice to do so.

> I put out the ads and see who applies.  That's something where if
> you don't get qualified candidates, maybe you would go back, but
> that's not my practice.

(Mark Dep. 65; J.S. I ¶ 50.)  Mark testified that with respect to other positions she had contacted

some candidates who had not applied.  (Mark Dep. 67-73; J.S. I ¶ 50.)  Mark testified that

Grande never mentioned plaintiff relative to the position, and that she would have considered

plaintiff for the position had she known plaintiff was interested, but that she "didn't know of

[plaintiff]".  (Mark Dep. 66.)

Eggleston testified that AGH's policies require that applicants reapply for positions that

become open.  (Eggleston Dep. 42-43; J.S. I ¶ 50.)  AGH's published recruitment policy,

however, includes a provision that "[e]xternal recruitment . . . may include . . . contacts with former applicants."  (Pl.'s App., Ex. 16; J.S. I ¶ 50.)

III.    **Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Concrete evidence must be provided for each element of each of a claim, and the evidence must be such that a reasonable fact-finder could find in that party's favor at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "A nonmoving party, like plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'"  Orenge v. Veneman, No. 04-cv-297, 2006 WL 2711651, at *2 (W.D. Pa. 2006) (quoting Celotex, 477 U.S. at 324).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party.  El v.

19

Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party.").  The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted.  Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id.  The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir.1993) (citing 10 CHARLES ALAN WRIGHT, ARTHUR MILLER AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); Pollack v. Newark, 147 F. Supp. 35, 39 (D. N.J. 1956), aff'd, 248 F.2d 543 (3d Cir.1957), cert. denied, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence" ).

## IV.    Discrimination Claims under the ADEA and Title VII

### A.    Burden-Shifting Framework

The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with conscious intent to discriminate.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  One manner in which a plaintiff can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  In cases where there is no direct evidence of discrimination, the United States Court of Appeals for the Third Circuit applies the burden-

shifting analysis set forth in McDonnell Douglas.  See Barber v. CSK Distrib. Servs., 68 F.3d 694 (3d Cir. 1995).  Under this analysis, a plaintiff must first establish a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 254.  If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production – but not the burden of persuasion – shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision.  Simpson v. Kay Jewelers Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998).  The defendant can satisfy this burden by offering evidence of a nondiscriminatory reason for its action.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  Once the defendant offers a legitimate, nondiscriminatory reason for the challenged conduct, the plaintiff has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).  The McDonnell Douglas burden-shifting analysis is applied to cases under Title VII and ADEA cases where no direct evidence of discrimination is introduced.  Smith v. Allentown, 589 F.3d 684 (3d Cir. 2009) (when no direct evidence of age discrimination is presented, the McDonnell Douglas burden-shifting framework is applicable and that application is not affected by Gross v. FBL Financial Servs., 129 S. Ct. 2343 (2009) (mixed-motive doctrine does not apply to ADEA claims)).

**B.  Prima Facie Case**

**1.  ADEA**

The ADEA prohibits an employer from discriminating against any employee on the basis of the employee's age if the employee is over forty years old.  29 U.S.C. §§ 623 (a), 631 (a).  To establish a prima facie case, the plaintiff must show that (1) she is age forty or older; (2) she was

qualified for the position; (3) she suffered an adverse employment action; and (4) she was

replaced by a sufficiently younger person or a younger, similarly situated employee.  Simpson,

142 F.3d at 644.

In the instant case, the parties do not dispute that plaintiff adduced sufficient evidence to

establish a prima facie case of age discrimination with respect to plaintiff's claim predicated on

defendants' hiring of Partsch for the November 2005 opening.  Plaintiff is a female, was over

forty and not selected for the pharmacy manager position for which she applied despite being

qualified.  Instead, a sufficiently younger employee was hired - Partsch was approximately fifteen

years younger than plaintiff - for that position which raises an inference of age discrimination.

Plaintiff is not asserting a claim for age discrimination with respect to the April 2006 hiring.

### 2.    Title VII

Title VII was enacted to prohibit employers from discriminating against employees with

respect to compensation, terms, conditions, or privileges of employment.  Burdine, 450 U.S. at

259.  To state a claim for discrimination under Title VII  a plaintiff must show by a

preponderance of the evidence that: (1) she was a member of the protected class; (2) she was

qualified for the position; (3) she was subject to an adverse employment action despite being

qualified; and (4) the employer filled the position with an individual with qualifications similar

to the plaintiff who was not a member of the protected class.  Scheidemantle v. Slippery Rock

Univ., 470 F.3d 535, 539 (3d Cir. 2006);  Barber v. CSX Distribution Serv., 68 F.3d 694, 698 (3d

Cir.1995) (applicant who applies for a position and is not hired has been subjected to an adverse

employment action).

The parties do not dispute that plaintiff satisfied the elements for a prima facie case with respect to plaintiff's claim of sex discrimination predicated on defendants' failure to hire plaintiff for the opening filled in November 2005.  Plaintiff is a member of a protected class as she is female, she was qualified for the position as she worked for one of the defendants in a similar position for fifteen years,  she suffered an adverse employment action when she applied and was not chosen to fill the position and the chosen candidate was male.  Id.

The parties dispute, however, that plaintiff is able to establish a prima facie case with respect to her claim predicated on defendants' failure to hire her for the position that was filled in April 2006 by Cecere.  Defendants contend that plaintiff's failure to apply for the position once it opened up is fatal to her ability to establish an essential element of the prima facie case.  Plaintiff did not brief this issue.  Plaintiff only asserted that the summary judgment motion should be denied in its entirety.  The court notes that "failure to apply formally for a job opening will not necessarily bar a Title VII . . . plaintiff from establishing a prima facie claim of discriminatory hiring, especially when the plaintiff has made every reasonable attempt to convey his interest in the job to the employer." Robinson v. Matthews Intern'l Corp., No. 06-1504, 2009 WL 735876, at *8 (W.D. Pa., Mar. 20, 2009) (citing E.E.O.C v. Metal Serv. Co., 892 F.2d 431, 348 (3d Cir. 1990); see Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 (1977) (noting that the application element of prima facie case could be relaxed when an informal application process is utilized); Lulu v. Network Appliance, Inc., 245 Fed. App'x 149, 152-53 (3d Cir. 2007) (finding that every reasonable effort to apply was not met where plaintiff asked her district manager to

consider her for the position and allegedly applied for the position by asking two vice presidents to consider her for the position, yet failed to apply formally for position).

Here, it cannot be concluded that a reasonable jury could find plaintiff made every reasonable attempt to convey interest. Plaintiff did not apply for the position in April 2006 and there is no record evidence to show plaintiff conveyed an interest in the position. The decision maker, Mark, testified that she did not know plaintiff and was not aware of plaintiff's interest in the position. A jury would have to speculate that plaintiff maintained an interest in the position and conveyed an intent to Mark. Therefore, the court finds that plaintiff failed to adduce sufficient evidence to establish a prima facie case with respect to her claim predicated on defendants' failure to hire her for the position that was filled in April 2006 by Cecere. Summary judgment will be granted in favor of defendants with respect to this claim.

### C.    Nondiscriminatory Reasons

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for reasons that are legitimate and nondiscriminatory. Burdine, 450 U.S. at 254. An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision. Fuentes, 32 F.3d at 763 (3d Cir. 1994); see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers. Burdine, 450 U.S. at 254; see Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 (1978).

Here, defendants stated that plaintiff was not chosen as the final candidate because she was not the best qualified candidate, i.e., she did not have recent experience with DRGs, J codes, HCPCS codes and reimbursement of high cost medications, and she lacked the required corporate and system-wide management experience needed for the position.  The court finds that these proffered reasons satisfy defendant's "relatively light burden" of production.  Fuentes, 32 F.3d at 763.

### D.      Pretext

The last part of the McDonnell Douglas burden-shifting framework requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)."  Fuentes, 32 F.3d at 763.  Once an employer has stated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff in order to survive summary judgment must satisfy at least one of the two prongs articulated by the United States Court of Appeals for the Third Circuit in Fuentes:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Id. at 764.

**(1)     Prong One**

A plaintiff must submit evidence that could cause a reasonable fact-finder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring her case to trial.  To discredit the employer's articulated reason, the plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, Sempier v. Johnson & Higgins, 45 F.3d 724, 764 (3d Cir. 1995), or produce additional evidence beyond her prima facie case.  Fuentes, 32 F.3d at 764.  The plaintiff must, however, demonstrate such:

> "weaknesses, implausibilities, inconsistencies, incoherencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence'" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. [Fuentes, 32 F.3d] at 764-65 (quoting [Ezold v. Wolf, Block, Schorr, & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)]).

Simpson, 142 F.3d at 644.

The question asked in prong one of the Fuentes test is not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the adverse result suffered by the plaintiff is discrimination.  Keller v. ORIX Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997).  An employment decision that would create a problem under prong one will likely turn on whether the stated reason for termination is so implausible that a fact-finder could not believe it to worthy of credence.  For example, in Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995), the plaintiff was fired due to deficient sales performance.  The evidence

26

of record, however, disclosed that the plaintiff received a bonus three months prior to his termination and that he was the only sales employee in his region to have received such a bonus.

The court held that, where the primary measure of the employee's performance was his sales, and where he was the leading salesperson in the region, the employer's stated reason for his termination was "contradictory to [its] admission that the most important standard of job performance is sales." Id. at 332. According to the court, "[a] factfinder could find it implausible that Quaker State would have fired Brewer for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program-sales." Id.

In the instant matter, plaintiff argues that defendants' nondiscriminatory, legitimate reasons were pretext for age and gender discrimination. She contends that she is able to show sufficient "weaknesses, implausibilities and inconsistencies" in defendant's proffered reasons. Simpson, 142 F.3d at 644. Plaintiff points to defendants' shifting reasons for plaintiff's non-selection and argues that statements made by defendants with respect to why she was not hired are unworthy of belief.

Grande stated that the best qualified candidate was selected based upon the candidate's corporate and system-wide experience, particularly with DRGs, J codes and HCPCS codes. He was able to gauge the candidate's qualifications and the relevant depth of experience the candidate had in corporate and system-wide experience with respect to the DRGs, J codes, and HCPCS codes that would be utilized in the system-wide projects. Grant described the DRGs as key to the forward direction of the company. Grande stated that he discussed the importance of

the DRGs and other codes with both plaintiff and Partsch.  Grande, Seidl and Weiloch later admitted that Partsch had no prior experience with DRGs.  Grant's subsequent statement that Partsch's attitude and wish to gain experience in a tertiary care hospital were enough to overcome the DRGs requirement contradicts his previous statement that experience with DRGs was key to the job.

Grant also indicated that Partsch was the better candidate with respect to a corporate systems approach and that plaintiff's experience with DRGs, J codes and HCPCS was not sufficiently recent to overcome her deficiencies in the corporate and systems-wide management experience needed for the position.  Plaintiff argues that the terms "corporate or system-wide" were not listed as part of the position description and should not have been a primary factor in selecting the final candidate.  Plaintiff argues that the interviewers never raised the systems or corporate requirement during her November 2005  interview.  Defendants' letter to the EEOC indicated that plaintiff was given an opportunity in her interview multiple times to expand on her corporate and system-wide experience.  Grande, Seidl and Wieloch each testified, however, that they had no recollection of asking plaintiff in her interview any questions about her corporate or system-wide experience.  Grande, along with Seidl and Weiloch, subsequently stated that the selection of Partsch (and non-selection of plaintiff) had little to do with the overall system-wide/corporate experience.

Another reason Grande gave for not selecting plaintiff was not selected for the pharmacy manager's position was that the job descriptions had significantly changed.  Grande's assertion that the job description had changed as a result of "several rewrites" was inaccurate as the August

2005 job description was virtually identical to the previous March 2004 job description.  The managers' revisions of the reasons upon which they found Partsch to be the better candidate raise inconsistencies and contradictions sufficient for a reasonable fact-finder to conclude that defendants' stated reasons are not worthy of credence.

It is not the function of this court to determine whether defendants' business judgment in hiring another candidate over plaintiff was correct.  Rather, the court must view the evidence to determine whether defendants' stated subjective reasons for not hiring plaintiff could be reasonably found by the fact-finder to be based on pretext.  Viewing the record in the light most favorable to plaintiff, the nonmoving party, the court finds that plaintiff proffered sufficient evidence for a reasonable fact-finder to conclude that defendants' reasons for not hiring plaintiff for the November 2005 opening were discriminatory.

### (2) Prong Two

As the court finds that plaintiff satisfied her burden that defendants' proffered reasons for not hiring her were pretextual under the first prong, the court need not examine the second prong of the Fuentes framework to determine if  plaintiff presented sufficient evidence of pretext.

## V.   Conclusion

After reviewing the submissions of the parties, the court concludes that plaintiff produced sufficient evidence for a reasonable fact-finder to conclude that defendants' reasons for failing to select plaintiff for the November 2005 pharmacy management position were based on pretext and to render a verdict in her favor on claims of age and sex discrimination.  Plaintiff, however, failed to adduce sufficient evidence to establish a claim of sex discrimination with respect to the

opening in April 2006 and summary judgment must be granted in favor of defendants on that

claim.  Accordingly, defendants' motion for summary judgment must be DENIED in part and

GRANTED in part.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: March 1, 2010